IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CASSIDY DALLAS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civ. No. MJM-24-952 |
| v. | * | |
| | * | |
| GEORGIA J. SHEIDY, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Cassidy Dallas ("Plaintiff")[1] filed this civil action against defendants Georgia J. Sheidy; Patient First Corporation, d/b/a/ Patient First Primary and Urgent Care–Aberdeen; and Patient First Maryland Medical Group, P.L.L.C. (collectively "Defendants") alleging sex discrimination in violation of 42 U.S.C. § 18116 and various state-law violations. This matter is before the Court on Defendants' Motion to Dismiss. ECF No. 10. The Motion is fully briefed and ripe for disposition. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall grant in part and deny in part the motion to dismiss.

I.     BACKGROUND

    A. Factual Background

The following facts are drawn from Plaintiffs' Amended Complaint (ECF No. 1).

---

[1] Plaintiff uses they/them or he/him pronouns.

1

On September 4, 2023, Plaintiff was at a Maryland campground. ECF No. 1, ¶ 38. Temperatures that day reached about 90 degrees Fahrenheit by noon, with a high of 99 degrees. *Id.* ¶ 37. Around noon, Plaintiff felt nauseous and light-headed and asked to sit in an air-conditioned car. *Id.* ¶ 39. Plaintiff and Mx. Gennalyn Williams[2] went to a convenience store, where Plaintiff became disoriented. ECF No. 1 ¶ 40. Plaintiff, along with Plaintiff's spouse, Mr. Matthew Dallas, and Mx. Williams, visited a Patient First Primary and Urgent Care clinic in Aberdeen, Maryland. *Id.* ¶¶ 1, 41. During the drive, Plaintiff felt they were losing consciousness. *Id.* ¶ 43.

Plaintiff entered Patient First Aberdeen around 1:41 p.m. *Id.* ¶ 44. While signing in for Plaintiff, Mr. Dallas selected Plaintiff's gender identity as "trans man" and gender assigned at birth as "female," and then answered the rest of the questions using Plaintiff's then-legal name, Alyssa Dallas. *Id.* ¶¶ 45–49. After completing the check-in, Mr. Dallas informed the worker at the check-in desk that, although Plaintiff was listed as Alyssa, their name was Cass, and they were a trans man to be addressed using they/them or he/him pronouns. *Id.* ¶ 50. While in the waiting room, Plaintiff was going in and out of consciousness. *Id.* ¶ 51.

When called to the desk to describe their symptoms, Plaintiff struggled to communicate, so Mr. Dallas relayed that Plaintiff had been in the sun all morning, was lightheaded and nauseous, and had lost consciousness. *Id.* ¶ 52. The desk worker called over a nurse, Ms. Sheidy, who asked if Plaintiff was overdosing, Plaintiff responded that they were completely sober. *Id.* ¶¶ 53-56. Ms. Sheidy asked Plaintiff to fill out paperwork. *Id.* ¶ 57. She held Plaintiff's hand saying, "I know I'm not supposed to do this," and touched Plaintiff's shoulder and sternum in the waiting room without asking for or receiving informed consent. *Id.* ¶¶ 57–59. Plaintiff fell forward in her chair and Ms.

---

[2] Mx. Williams uses they/them or he/him pronouns.

Sheidy performed a sternal rub[3] on Plaintiff in the waiting room before leading Plaintiff into a private examination room.[4] *Id.* ¶¶ 60–63.

Once in the exam room, Ms. Sheidy pressed her body against Plaintiff's body and chair with one hand on Plaintiff's arm and another on Plaintiff's opposite shoulder. *Id.* ¶ 64. Ms. Sheidy said that Plaintiff was "hot" but did not try to cool Plaintiff off. *Id.* ¶ 65. Ms. Sheidy then took Plaintiff's vitals, recording their pulse at an elevated rate of 125 beats per minute around 1:48 p.m. *Id.* ¶¶ 67–68. At that time, Plaintiff provided their medical history to Ms. Sheidy, including describing an anti-trans assault that traumatized Plaintiff and led to a diagnosis of posttraumatic stress disorder ("PTSD"). *Id.* ¶ 69. Plaintiff informed Ms. Sheidy that they survived an attempted murder, and Ms. Sheidy responded, "Did you attempt to murder yourself?" *Id.* ¶¶ 70–71. Ms. Sheidy dismissed the idea that Plaintiff was suffering from dehydration, instead blaming Plaintiff's condition on any hormone therapy they were receiving. *Id.* ¶ 72. Ms. Sheidy continued to touch Plaintiff throughout the examination without asking for or receiving informed consent. *Id.* ¶ 73.

Following Ms. Sheidy's comments, Plaintiff asked Mx. Williams to get help. *Id.* ¶ 74. Mx. Williams left the exam room and requested another nurse. *Id.* ¶ 75. Ms. Sheidy left Plaintiff, and Plaintiff's condition worsened, though no new nurse came to provide treatment. *Id.* ¶¶ 76–77. Plaintiff experienced muscle spasms, mumbling speech, and eyes rolling back into their head, and they then fainted. *Id.* Mr. Dallas left the exam room and loudly stated that he would provide care to Plaintiff himself. *Id.* ¶ 78. He then dampened a paper towel and placed it on Plaintiff's forehead.

---

[3] A sternal rub gauges a patient's consciousness if they are unresponsive to verbal prompting. ECF No. 1, ¶ 62.

[4] According to Plaintiff, "Patient First's standard 'Maryland Treatment and Payment Policies' form for new patients states that 'Patient First will provide care consistent with the prevailing standards of medical practice' and that a patient has 'the right to consent to, refuse, or stop any procedure or treatment at any time.'" ECF No. 1, ¶ 58.

*Id.* A different nurse, Ms. Cindy Purvis, entered the exam room, and Plaintiff told the new nurse about their trans identity, pronouns, history of trauma, and PTSD diagnosis, and asked the nurse to seek and receive affirmative consent before touching Plaintiff. *Id.* ¶¶ 79–80.

Ms. Purvis brought 4 milligrams of Zofran to treat Plaintiff's nausea, and Mr. Dallas placed the medication under Plaintiff's tongue. *Id.* ¶ 81. Ms. Purvis then took an electrocardiogram ("EKG") reading of Plaintiff, which required Plaintiff to take off their shirt. *Id.* ¶¶ 82–83. Ms. Purvis asked Plaintiff about the scars on their chest, and Plaintiff explained the scars were from top surgery. *Id.* ¶¶ 83–84. Ms. Purvis misgendered Plaintiff multiple times, referring to Plaintiff as "she." *Id.* ¶ 85. She also made statements to the effect that she was trying not to offend Plaintiff. *Id.* ¶ 86. The EKG returned a reading of "Sinus Tachycardia," an elevated heart rate exceeding 100 beats per minute, which can indicate severe dehydration. *Id.* ¶¶ 87–89. Over 50 minutes from Plaintiff's arrival at Patient First, Ms. Purvis provided Plaintiff with 1,000 cubic centimeters of IV fluids, their first influx of IV fluids. *Id.* ¶¶ 90–91.

As Plaintiff was receiving the fluids, the physician's assistant on call, Nicholas F. Wunder, entered the exam room and noted his agreement with the EKG. *Id.* ¶¶ 92, 95. Plaintiff told him about Ms. Sheidy's transphobic comments and the delay in receiving fluids. *Id.* Mr. Wunder apologized and said that Plaintiff would not see Ms. Sheidy again. *Id.* ¶¶ 93–94. Plaintiff then used the bathroom and noticed their urine was darkly colored and there appeared to be blood in the urine. *Id.* ¶ 96. Plaintiff asked Ms. Purvis if she needed a urine sample, but Ms. Purvis said it was not necessary. *Id.* ¶ 97. Patient First never took a urine sample from Plaintiff. *Id.* ¶ 98.

Plaintiff then received a second bag of IV fluids. *Id.* ¶ 99. Insertion of the IV needle caused Plaintiff to bleed, which Patient First did not clean. *Id.* ¶ 100. Notes from a physical exam in Plaintiff's medical records from Patient First mention Plaintiff's dry mucus membranes, which can

result from dehydration. *Id.* ¶¶ 102–03. Patient First took a blood sample from Plaintiff, and testing identified potassium below the normal range and sodium just inside the low end of normal. *Id.* ¶ 104. Low levels of potassium and sodium in the blood can indicate dehydration. *Id.* ¶ 105. Plaintiff's blood test also showed an elevated white blood cell count, which can indicate infection. *Id.* ¶¶ 106–07.

Plaintiff left Patient First around 4:45 p.m. *Id.* ¶ 108. After leaving Patient First, Plaintiff, suffering from dysuria (frequent, painful urination), had to stop every 20 to 30 minutes to use the bathroom. *Id.* ¶ 109. That night, Plaintiff traveled to Pennsylvania. *Id.* ¶ 110.

The following afternoon, Plaintiff visited a clinic in Pennsylvania. *Id.* ¶ 112. That clinic took a urine sample from Plaintiff, diagnosed them with acute cystitis (inflamed bladder) and with hematuria (blood in urine), and prescribed Bactrim. *Id.* ¶ 113. Plaintiff alleges that dehydration is a leading risk factor for bladder and urinary tract infections. *Id.* ¶ 114.

Plaintiff feels traumatized from their experience at Patient First, which exacerbated existing symptoms of their preexisting PTSD. *Id.* ¶ 115.They have increased visits to a psychiatric nurse practitioner and licensed mental health counselor. *Id.* ¶¶ 116–17. Plaintiff was prescribed medication for anxiety, panic, and flashbacks, and their dosage was increased on other medications prescribed for depression and anxiety. *Id.* ¶ 118. Plaintiff scored highly on various tests indicating severe anxiety, moderate depression, and probable PTSD. *Id.* ¶¶ 120–23. Plaintiff also has experimental therapy treatment involving intravenous administration of ketamine and began an at-home treatment with an FDA-approved nasal administration of ketamine. *Id.* ¶¶ 124–25

B.  **Procedural Background**

Plaintiff filed their Complaint on April 2, 2024. ECF No. 1. The Complaint alleges sex discrimination in violation of the Affordable Care Act ("ACA") (codified at 42 U.S.C. § 18116)

against the Patient First Defendants and various state-law claims against all Defendants, including three counts of battery, a count of intentional infliction of emotional distress ("IIED"), and a count of negligence for medical malpractice. *Id.* Defendants filed a motion to dismiss seeking dismissal of Count I (sex discrimination) and Count V (IIED). ECF Nos. 10 & 10-2. Plaintiff filed a response in opposition to Defendants' motion, ECF No. 12, and the Defendants filed a reply in support of their motion, ECF No. 17.[5] On January 31, 2025, Plaintiff filed a notice of supplemental authority, ECF No. 18, and Defendants responded, ECF No. 19.[6]

## II.  STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

A motion to dismiss under Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, a plaintiff must plead enough factual allegations "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads

---

[5] In their reply, Defendants argue that Plaintiff's battery claims—Counts II, III, and IV—should be dismissed. This argument is waived because Defendants failed to make it in their opening brief. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court.") (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013)); *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief[.]") (citing *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)).

[6] Defendants contend that Plaintiff's notice of supplemental authority is improper because it is really an improper surreply and ask that ECF No. 18 be disregarded or stricken. ECF No. 19. The notice need not be stricken. The Court has considered the supplemental authority cited in the notice but declines to consider any legal arguments Plaintiff presents in the notice.

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not include "detailed factual allegations" to satisfy Rule 8(a)(2), but it must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555–56 (internal quotation marks omitted). Furthermore, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (cleaned up). A complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* "[T]ender[ing] 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (third alteration in *Iqbal*).

When considering a motion to dismiss, a court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). At the same time, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" the defendant's liability for the alleged wrong and the plaintiff's entitlement to

7

the remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert denied*, 566 U.S. 937 (2012).

### III. DISCUSSION

#### A. Sex Discrimination under the ACA

In Count I of the Complaint, Plaintiff asserts a claim for sex discrimination in violation of § 1557 of the ACA against Patient First Defendants. This provision, now codified at 42 U.S.C. § 18116, contains a non-discrimination clause:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a). This provision thus incorporates protections from Title IX, prohibiting sex-based discrimination by an institution receiving federal assistance. The parties do not dispute that discrimination based on Plaintiff's transgender identity qualifies as sex discrimination. *See e.g., Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020).

To prevail on a § 1557 claim, a plaintiff must show: (1) "defendant is a health program or activity that receives federal funds," and (2) "plaintiff was subjected to discrimination in healthcare services on the basis of sex." *Fain v. Crouch*, 618 F. Supp. 3d 313, 330–31 (S.D.W. Va. 2022), *aff'd sub nom. Kadel v. Folwell*, 100 F. 4th 122 (4th Cir. 2024). "Importantly, the discrimination

8

must be intentional." *Lucas v. VHC Health*, 128 F.4th 213, 221 (4th Cir. 2025) (citation omitted). When the alleged discrimination is based upon the conduct of institutional defendant's employee, the plaintiff "must provide a basis for imputing liability" to the defendant for its employee's conduct. *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 700 (4th Cir. 2007). Liability for the discriminatory conduct of an institutional defendant's employee may not attach to the institution via *respondeat superior* or constructive notice. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 265 (4th Cir. 2021) (citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 285 (1998)). The plaintiff must establish that the institution "had 'actual notice' or 'actual knowledge' of the alleged misconduct." *Id.* (quoting *Gebser*, 524 U.S. at 288–90). Specifically, liability may attach "only if 'an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond' or displays 'deliberate indifference' to discrimination." *Jennings*, 482 F.3d at 700 (quoting *Gebser*, 524 U.S. at 290). Deliberate indifference, in this context, would include a refusal by an official with actual notice "to take action to bring the [institution] into compliance" or "an official decision by the [institution] not to remedy the violation." *Gebser*, 524 U.S. at 290.

Here, Defendants do not dispute that they receive federal funds but argue that the Complaint does not allege that Patient First Defendants failed to respond adequately after receiving actual notice of discriminatory conduct by its employees. ECF No. 10-1 at 8–11; ECF No. 17 at 4–6. Defendants are correct. Even assuming that Ms. Sheidy and/or Ms. Purvis's conduct amounted to sex discrimination, there is no allegation that an official with authority to address the discrimination received actual notice of the alleged discriminatory behavior. To the extent that the physician's assistant Mr. Wunder had "authority to address the alleged discrimination and to

9

institute corrective measures" and that he received notice about Ms. Sheidy's behavior through Plaintiff's complaint, there is no allegation that Mr. Wunder either failed to respond adequately or displayed deliberate indifference to Plaintiff's complaint. *Jennings*, 482 F.3d at 700 (quoting *Gebser*, 524 U.S. at 290). After receiving the complaint about Ms. Sheidy's transphobic comments and behavior, Mr. Wunder apologized and said that Plaintiff would not see Ms. Sheidy again. ECF No. 1, ¶¶ 92–94. There is no allegation that Plaintiff continued to be subjected to discriminatory behavior from Ms. Sheidy after that. Insofar as Plaintiff alleges that Ms. Sheidy is not the only Patient First employee to act in a discriminatory manner, Plaintiff has not pleaded sufficient facts to support that claim.

Plaintiff's supplemental authority is distinguishable on the facts. *See Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507 (4th Cir. 2025). In *Ricketts*, the U.S. Court of Appeals for the Fourth Circuit reversed denial of a plaintiff's motion for leave to amend where the plaintiff, a black high school student, alleged that she was harassed by other students and asserted a claim of race-based harassment under Title VI against the school system.[7] *Id.* at 514–20. The court recognized that, in order to state a plausible claim, the plaintiff was required to plead that "the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and . . . the school acted with deliberate indifference to the alleged harassment." *Id.* at 521. The court found the plaintiff's allegations sufficient to state a claim under Title VI. *Id.* As to the actual notice requirement, the plaintiff alleged that school administrators with authority to take corrective

---

[7] "Title VI claims 'are parallel' to Title IX claims and 'operate in the same manner.' *Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1273 (11th Cir. 2023). Accordingly, the standard articulated by the Supreme Court for Title IX claims in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999) applies." *Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 521 (4th Cir. 2025).

measures were made aware of various specific acts of discrimination the plaintiff and other black students suffered at the school, including through phone calls, emails, and contacts from local civil rights advocates. *Id.* at 522–23. The proposed amended pleading also sufficiently alleged conduct by school administrators that reflected deliberate indifference, including refusal to meet in response to discrimination complaints and doing nothing to stop harassment and specific discriminatory acts while they were ongoing. *Id.* at 523.

The Complaint in the instant matter does not include comparable allegations of actual notice and deliberate indifference. Specifically, here, there is no allegation that Plaintiff reported Ms. Sheidy's discriminatory behavior to any Patient First manager or administrator with the authority to correct her behavior or that Plaintiff continued to be subjected to discrimination following her complaint to Mr. Wunder. Accordingly, Defendants' motion to dismiss as to Count I will be granted, and Count I will be dismissed without prejudice.

### B. IIED

Plaintiff argues that their IIED claim, which is based on Ms. Sheidy's conduct, satisfied the plausibility standard because they allege conduct by Ms. Sheidy that was reckless, extreme, and outrageous. Plaintiff argues that Ms. Sheidy's conduct was reckless given her knowledge of Plaintiff's identity and trauma history, and that her conduct was extreme and outrageous given her position of medical authority. Plaintiff further argues that there is a plausible link between their severe emotional distress and Ms. Sheidy's conduct. ECF No. 12 at 28–29. In seeking to dismiss the IIED claim, Defendant primarily argues that none of Ms. Sheidy's conduct is extreme or outrageous. ECF No. 10-1 at 19–20.

Under Maryland law, to prove an IIED claim, Plaintiff must show that "[defendant's] conduct was intentional or reckless; the conduct was extreme and outrageous; a causal connection

11

between the wrongful conduct and the emotional distress; and that the emotional distress was severe." *Burgess v. Goldstein*, 997 F.3d 541, 554 n.5 (4th Cir. 2021) (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)). The Maryland Supreme Court has recognized that a defendant's conduct is intentional or reckless where "[s]he desires to inflict severe emotional distress, and also where [s]he knows that such distress is certain, or substantially certain, to result from h[er] conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." *Harris*, 380 A.2d at 614. *See also Kentucky Fried Chicken Nat. Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11–12 (Md. 1992).

Whether the conduct complained of is extreme and outrageous is, in the first instance, for the court to determine. *Batson v. Shiflett*, 602 A.2d 1191, 1216 (Md. 1992). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kentucky Fried Chicken Nat. Mgmt. Co.*, 607 A.2d at 11 (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)). "To be actionable, the conduct relied upon in this case 'must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung.'" *Robinson v. Cutchin*, 140 F. Supp. 2d 488, 494 (D. Md. 2001) (quoting *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1064 (Md. Ct. Spec. App. 1986), *cert. denied*, 507 A.2d 631 (1986)).

Comments e and f to § 46 of the *Restatement (Second) of Torts* are particularly relevant here. Comment e states, "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives h[er] actual or apparent authority over the other, or power to affect [their] interests. *Restatement (Second) of Torts* § 46, cmt. e. *See Figueiredo-Torres v. Nickel*, 584 A.2d 69, 74–77 (1991) (recognizing a cognizable

IIED claim where defendant psychologist engaged in sexual relations with plaintiff's wife while he was counseling the couple). Comment f states:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if [s]he did not know.

*Restatement (Second) of Torts* § 46, cmt. f.

Here, viewing their allegations in the light most favorable to them, Plaintiff has alleged sufficient facts to plead recklessness by Ms. Sheidy. After entering the exam room with Ms. Sheidy, Plaintiff disclosed their medical history, which included their trans identity and the description of an anti-trans assault that traumatized Plaintiff and led to a PTSD diagnosis, which Plaintiff stated was an "attempted murder." ECF No. 1, ¶¶ 69–70. After Plaintiff disclosed their trauma resulting from that assault, Ms. Sheidy asked Plaintiff, who was in a state of distress at the time, if they "attempt[ed] to murder [themselves][.]" *Id.* ¶ 70. Then, dismissing the idea that Plaintiff was dehydrated, Ms. Sheidy, Plaintiff's care provider at the time, blamed Plaintiff's condition on any hormone therapy they were receiving. *Id.* ¶ 72. Based on Plaintiff's disclosures to Ms. Sheidy, it is plausible that either Ms. Sheidy knew Plaintiff was likely to experience severe emotional distress from her subsequent conduct or Ms. Sheidy acted recklessly or with a deliberate disregard of a high degree of probability that Plaintiff would experience emotional distress.

Similarly, because Ms. Sheidy was aware of Plaintiff's trauma history and PTSD diagnosis, a reasonable trier of fact could find it extreme and outrageous for a medical provider to ask a patient who had survived an anti-trans "attempted murder" if they, instead, had attempted to commit suicide and then dismissing their medical concerns while blaming their symptoms on potential hormone therapy. After hearing Plaintiff's trauma history and PTSD diagnosis, it is

plausible that Ms. Sheidy, as a medical provider, knew or should have known that Plaintiff was "particularly susceptible to emotional distress[,]" considering the state of severe physical distress that Plaintiff was visibly experiencing at the time. *Restatement (Second) of Torts* § 46 cmt. e, f.

Plaintiff's emotional distress is plausibly alleged to have been severe and causally connected to Ms. Sheidy's conduct. According to Plaintiff, their PTSD has worsened; they have increased visits to both a psychiatric nurse practitioner and a licensed mental health counselor; they increased their medication dosage; they have scored highly on anxiety, depression, and PTDS tests; and they have started experimental ketamine therapy. ECF No. 1, ¶¶ 115–25. This Court is cognizant that Maryland courts are extremely hesitant to find cognizable IIED claims, but here, Plaintiff's allegations are adequate to survive a motion to dismiss.

Defendants' Motion to Dismiss will be denied as to Count V.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED in part, as to Count I, and DENIED in part, as to Count V.

A separate Order will follow.

3/31/25
Date

/S/
Matthew J. Maddox
United States District Judge